## In re 2,098 TONS OF COAL.*

### THE IONIA.

(Circuit Court of Appeals, Seventh Circuit. January 3, 1905.)

#### No. 1,082.

1. SHIPPING—DEMURRAGE—COMMENCEMENT OF LAY DAYS FOR DISCHARGING.

Under a bill of lading requiring a vessel to deliver a cargo of coal at a specified dock, the voyage is not completed, and the lay days for discharging do not commence to run, until she reaches such dock and is in condition to discharge, unless she is prevented from reaching it through the active fault of the charterer or consignee.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 592.

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

2. SAME—TIME FOR DISCHARGING—REASONABLE DISPATCH.

Where a charter party or bill of lading contains no provision with respect to the lay days for discharging, an implied obligation arises on the part of the charterer or consignee to give the vessel reasonable dispatch, determined by the circumstances then existing; but in such case he is not an insurer against delay, nor liable because of delay caused by circumstances beyond his control, such as the presence of another vessel discharging at the dock where delivery is to be made, and which is the only one available, or by a temporary derangement of the dock machinery used for discharging, which he could neither anticipate nor prevent.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 580–582.]

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

In Admiralty.

For opinion below, see 128 Fed. 514.

This is a libel in rem filed by the Ionia Transportation Company, the owner of the steamer Ionia, against her cargo of coal, for demurrage, for delay in unloading at the port of Racine. The second article of the libel charges that in October, 1903, the Kanawha Fuel Company shipped on board the steamer Ionia, lying at the port of Toledo, in the state of Ohio, a cargo of coal, to be therein carried from the port of Toledo to the port of Racine, Wis., and there delivered to the Weaver & Austin Coal Company, Clancy Dock, Racine, Wis., or its assigns. By the third article of the libel it is charged that on October 24, 1903, the steamer set sail from Toledo with the coal on board, for the port of Racine, and there safely arrived at noon of the 29th of October, 1903, ready to unload and discharge her cargo at Clancy Dock, and so notified Clancy & Co., the owners of and in charge of the dock, on the 30th of October; that Clancy & Co. disclaimed any interest in the coal, stating the owners of it to be the J. I. Case Threshing Machine Company, of Racine; that the latter company was by the master on the 30th day of October notified of the arrival of the steamer; that no immediate steps were taken to unload the vessel; and that the master made claim for $150 per day for demurrage, the claim to take effect 24 hours after the arrival of the vessel. By the fourth article it is charged that the owners of the cargo were not ready to receive, but paid $1,000 to apply on freight, leaving a balance for freight of $259. The libelant claimed damages for detention in the sum of $1,800. Upon seizure of the coal, the J. I. Case Threshing Machine Company, claimant, bonded the coal, and, intervening for its interest as owner of the cargo, answered, admitting the second and third articles of the libel, and alleged that J. F. Clancy & Co., of Racine, owned

* Rehearing denied February 10, 1905.

and operated the coal dock at the port of Racine known as the "Clancy Dock," which was specially fitted with apparatus for unloading coal-laden vessels, and was the only obtainable dock at the port of Racine specially fitted for the unloading of coal laden vessels, or at which the steamer Ionia could be discharged; that it had not the capacity to discharge more than one vessel at a time; that Clancy & Co. for a long time had been engaged in the business of coal wharfingers, unloading coal-laden vessels at that dock, all of which was known or ought to have been known to the libelant at the time of the shipment of the coal; that prior to the shipment the respondent had made arrangements with Clancy & Co. to discharge the steamer Ionia at that dock; that, upon the arrival at the port of Racine of the steamer Ionia with the cargo of coal, the steamer Marina, also laden with a cargo of coal consigned to others than the respondent, was discharging her cargo at the Clancy Dock; that the capacity of the dock did not admit of the discharge of more than one steamer at a time; that the Marina was discharged on November 12, 1903, and thereupon the Ionia was at once given the dock, and was promptly discharged and unladen; that any delay caused to the steamer Ionia in obtaining a place at the dock was caused by reason of the prior arrival and presence at the dock of the steamer Marina, over which the respondent had no control, and not by any negligence, fault, or other cause attributable to, or under the control of, the respondent or the shippers of the coal; that, if the steamer Marina was not promptly discharged upon her arrival at the dock, the same was not caused by any negligence, fault, or other cause attributable to, or under the control of, the respondent or shippers of the coal; that the respondent, as owner of the cargo, was at all times after the arrival of the Ionia ready to receive and unload the cargo so soon as the steamer Marina had been discharged and was out of the way; and that the Ionia was given a berth and promptly discharged so soon as the steamer Marina was out of the way. The respondent admitted the balance on freight of $259, which sum it tendered to the libelant, and deposited in the registry of the court for the use of the libelant.

The facts are as follows:

Long before the shipment, Clancy & Co. owned the dock in question, which was specially fitted with apparatus for unloading coal vessels, one at a time, and was the only obtainable dock at Racine at which vessels such as the Ionia could be discharged; the dock being located below the bridges across the river at Racine, and the Ionia being too large to pass the bridges. The only other coal dock below the bridges was that of the gaslight company, which was not available. The owners of the dock were accustomed to unload not only their own coal, but unloaded coal-laden vessels for others. The apparatus for unloading vessels at the dock consisted of the "bucket system." In October, 1903, Clancy & Co. changed the system to that of the "clam-shell system," which employs an iron bucket, opening like a clam shell, and, dipping into the cargo, closes and unloads automatically—it being thereby intended to do away with stevedores—and is supposed to operate much more rapidly than the bucket system. The clam-shell system had been for some time in use in the ports of Milwaukee, Chicago, Manitowoc, Sheboygan, and Escanaba. About October 19, 1903, while Clancy & Co. were engaged in changing the system, the owners of the steamer Marina, then lying coal-laden at the port of Milwaukee, which was blocked with coal-laden vessels waiting their turn to discharge, applied to Clancy & Co. to ascertain if they could discharge her at the port of Racine, to which they replied that they would if the vessel would wait until they had finished putting in the clam-shell system. This being agreed to, the Marina arrived in Racine October 19th. On October 28th, the day previous to the arrival of the Ionia, the discharge of the Marina's cargo of coal at the Clancy Dock commenced, working with one "clam-shell," and installing others from time to time as fast as they were furnished by the manufacturer, who guarantied them to do the work. They were not, however, furnished promptly by the manufacturer, and, when put in, did not work satisfactorily, but now and then broke down. Clancy's Dock was lighted by an independent electric plant on the dock. During the unloading of the Marina this plant burned, neces-

sitating a new wiring of the dock before connection could be made with the city lighting plant, during which time a short day's work was done both on the Marina, and afterward on the Ionia, occasioning a delay of 1½ hours a day. No claim is made by the libelant for demurrage for any loss of time on account of the destruction of the electric light plant. By reason of the failure of the "clam shells" to work as guarantied, the burning of the electric lighting plant, and some rainy weather for part of a day, the final discharge of the Marina was delayed until November 11th. Immediately after her discharge the Ionia was given a berth at the dock, the bucket system was restored, and she was completely discharged with good dispatch on November 16th at noon; being delayed for a part of a day by heavy rain.

The respondent had a coal dock near the Clancy Dock, but the depth of water was insufficient to accommodate large coal-laden vessels, like the Ionia. The respondent had contracted with Clancy & Co. that the latter should receive several carloads of coal at their dock, and transfer the same to the coalyard of the respondent. The steamer Ionia was chartered by one Gilchrist, of Cleveland, and the master got his orders from Chamberlain, in Detroit. The master states that in a conversation with Mr. Cowling, the representative of the respondent at Racine, he was told that the cargo had been shipped about six days ahead of their orders; and Cowling laid it to the Weaver & Austin Coal Company, who were the consignees. The bill of lading is dated at Toledo, October 24, 1903, and is as follows:

"Shipped in good order by K. F. Co. for account and risk of whom it may concern, on board the Str. Ionia, ...... whereof ...... is Master, now lying in Port of Toledo, Ohio, and bound for Racine, Wis., the following articles, to be delivered in like good order, at the Port of destination, (the dangers of navigation, fire, collisions and breakage of canals only excepted) unto the Consignee named in the margin or to ....... Assigns.

"In Witness Whereof, The Master of said Vessel hath affirmed ...... Bills of Lading of this tenor and date, one of which accomplished, the other to stand void.

| "Weaver & Austin Coal Co. Clancy Dock, Racine, Wis. | | 1209–800 tons ¾ Lump 888–1900 tons ROM Coal |
|---|---|---|
| | Total | 2098–700 |
| Rate 60 Cents. | | R. J. MEFFORD." |

The date of chartering does not definitely appear. It was probably about the 21st of October. There is no evidence that when the vessel was chartered either the representative of the vessel or of the cargo had knowledge of any fact that might cause detention of the boat upon her arrival at Racine.

Upon the hearing below, the court pronounced for the libelant for the balance of the freight money claimed, and pronounced for the respondent that the claim for demurrage be dismissed, from which decree the libelant appeals to this court.

John C. Richberg, for appellant.
George D. Van Dyke, for appellee.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

JENKINS, Circuit Judge, after stating the facts, delivered the opinion of the court.

The obligation of the Ionia was to deliver her cargo at a particular dock. The voyage was not completed, nor was her obligation discharged, until she reached the designated place of discharge, ready to deliver her cargo. The ship must reach the place designated. Murphy v. Coffin, 12 Q. B. D. 87; Dahl v. Nelson, 6 App. Cas. 38, 44; Basti-

fell v. Lloyd, 31 L. J. Ex. 413. In the latter case, by the terms of the charter party, the ship was to proceed to Mr. Coles' Wharf, Rochester, or so near thereto as she might safely get. The vessel was detained for some days, waiting for better tides. Lord Chief Baron Pollock observed that:

"The master is bound to take his ship to Coles' Wharf, unless prevented by some permanent obstruction. This is a contract to proceed to a certain place, and if, in the ordinary course of navigation, the ship could get there, the master was bound to take her."

In Strahan v. Gabriel, cited by Lord Esher in Dahl v. Nelson, supra, the discharging place named was a quay. The ship on arrival found the only quay berth occupied by another vessel. The shipowner offered to discharge across the ship which occupied the quay berth if the charterer would pay for the stage and labor. The charterer refused, and the shipowner claimed demurrage. Lord Esher held that the lay days did not commence to run until the plaintiff's ship was alongside the quay, that being the place named whereat the voyage was to end. See, also, The M. S. Bacon (C. C.) 3 Fed. 344; Finney v. Grand Trunk Ry. Co. (D. C.) 14 Fed. 171; Fish v. 150 Tons of Brown Stone (D. C.) 20 Fed. 201; The J. E. Owen (D. C.) 54 Fed. 185; The Viola (D. C.) 90 Fed. 750; The Cyrenian (D. C.) 123 Fed. 169; Weaver v. Walton, 1 Flipp. 441, Fed. Cas. No. 5,488; Burmester v. Hodgson, 2 Camp. 488; Ford v. Colesworth (1868) L. R. 5 Q. B. 544; Hick v. Raymond (1893) App. Cas. 22; and Huelthen v. Stewart & Co., 2 K. B. (1902) 199.

The rule would not be applicable if the delay in reaching the designated dock is attributable to the active fault of the charterer, or the owner of the cargo. No such fault is here shown. The record discloses no knowledge by the consignee, up to the time of the sailing of the Ionia from Toledo, of the installment of the "clam-shell" system on the Clancy Dock, if such change was then in progress. The statement of the master that the representative of the consignee said that the coal had been shipped ahead of the order of the consignee does not impute a fault to the consignee or to the charterer which was proximate to the delay of the vessel in reaching the dock.

The duty of the consignee, then, in the absence of active fault upon its part, began when the vessel reached the dock, ready to be delivered of her cargo. There being no stipulation in the bill of lading with respect to the time of unloading and discharge, the duty imposed was to give the vessel reasonable dispatch, determined by the circumstances then existing. Corrigan v. Iroquois Furnace Co., 41 C. C. A. 102, 104, 100 Fed. 870. The consensus of the English and American cases is well stated by Judge Sanborn in the case of The Empire Transportation Co. v. Philadelphia & Reading Coal & Iron Co., 23 C. C. A. 564, 571, 77 Fed. 919, 925, 35 L. R. A. 623:

"(1) Where the charter of a ship is silent as to the time of unloading and discharge, there is no implied agreement that the charterer will unload or discharge her in the customary time at the port of delivery, regardless of all extraordinary circumstances and unforeseen obstacles.

"(2) The implied contract is to unload and discharge her in such time as is reasonable, in view of all the existing facts and circumstances, ordinary and

extraordinary, legitimately bearing upon that question at the time of her arrival and discharge.

"(3) This implied contract to discharge the vessel in a reasonable time is, in effect, a contract to discharge her with reasonable diligence.

"(4) The burden is on him who seeks to recover damages for the delay of a vessel under such a contract to prove that the charterer did not exercise reasonable diligence to discharge her, under the actual circumstances of the particular case.

"(5) Proof that the vessel was delayed in unloading beyond the customary time for unloading such cargoes at the port of her delivery throws upon the charterer the burden of excusing the delay by proof of the actual circumstances of the delivery, and his reasonable diligence thereunder."

See Postalthwait v. Freeland (H. of L.) 5 App. Cas. 599; Lyle Shipping Co., Ltd., v. Corporation of Cardiff (C. of A.) 2 Law Reports, Q. B. D. '638. In the former case it is declared that the duty of the consignee "is not absolute, but to do his best." In the latter case it is said that the test of reasonable dispatch is "not a hypothetical state of things"—not "an ordinary state of circumstances"—but "the actual state of things at the time of the discharge." Within this rule, we think, the consignee is absolved of fault. It had no control of the dock  The slight delay in discharging the cargo after the vessel was fast to the dock arose from the change from the clam-shell to the bucket system—it being found that the former did not work satisfactorily—and the change was in order to give the vessel quicker dispatch. After the vessel was berthed, the total delay from all causes did not exceed one day. For that the consignee was not responsible, and the delay so caused, in effect expedited the delivery of her cargo. Under the clam-shell system installed, and which, owing to the default of the contractor, was imperfect and operated poorly, the time of discharge would have been longer. We abate not one jot from the statement in the Corrigan Case, supra, that "a vessel should ordinarily have prompt dispatch, for such is essential to her profitable employment"; but, holding that the consignee is not responsible for the change of system inaugurated by the owner of the dock, or for the giving place to and discharging the Marina prior to the arrival of the Ionia, we see no circumstance of fault in the discharge of the latter vessel. The owners of vessels can readily protect themselves by the insertion in their contracts of a time limit for the release of the vessel after her arrival in port, in which case even unavoidable delay would not excuse the charterer.

The decree is affirmed.