SCHOONER MAHUKONA CO. v. 180,000 FEET OF LUMBER et al.

(District Court, N. D. California. January 10, 1906.)

No. 12,644.

SHIPPING—TIME FOR LOADING UNDER CHARTER—REASONABLE DISPATCH.

A verbal charter of a schooner to carry a cargo of lumber fixed the port of loading, but contained no stipulations as to the time she should arrive, nor for lay days, nor for her loading at any particular dock or place. Without her fault she was delayed, and did not arrive until 60 days after she was expected by both parties; but when she arrived she was loaded by the charterer, although the cargo originally intended for her had in the meantime been forwarded. *Held* that, the charter being still in force, it was the duty of the charterer thereunder to have a cargo ready and to load her with reasonable dispatch, and that it was not relieved from such absolute obligation by the circumstances nor by the fact that the mill at which she was directed to load did not have sufficient lumber on hand and it was necessary to wait until it could be manufactured, even though reasonable diligence was exercised in providing the cargo.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 572, 573.]

In Admiralty. Suit against charterer for demurrage.

Milton Andros, for libelant.

Nathan H. Frank, for claimant.

DE HAVEN, District Judge. This is an action to recover damages in the nature of demurrage for the alleged detention of the schooner Mahukona for a period of 33 running days, while being loaded by the Charles Nelson Company, charterer, at Everett, Puget Sound, under a verbal charter entered into on or about February 2, 1902, and confirmed on February 20th of the same year by a writing of which the following is a copy:

"The Charles Nelson Company. Wholesale Lumber, Shipping and Commission. 6 California Street.

"San Francisco, February 20th, 1902.

"Messrs. Hind, Rolph & Co., San Francisco, Cal.—Gentlemen: We beg to confirm charter of Schr. "Mahukona" from Everett, Wash., to Oakland Long Wharf, (one place) and/or San Francisco, (one place), freight to be at $4.25 per M. ft.

"Yours truly,                              James Tyson, Manager.
"Accepted. Hind, Rolph & Co."

It appears from the libel that when the contract for charter was originally made, and also at the date of the confirmation, the Mahukona was bound on a voyage from Zamboango, Philippine Islands,

to some port on Puget Sound, and the contract of charter contained no express provision in relation to lay days, nor any stipulation fixing the time within which the vessel was to arrive and be ready to receive cargo. The libel further alleges that the Mahukona arrived at Everett, Puget Sound, May 6, 1902, and was by order of the charterer placed alongside the wharf of the Weyerhauser Timber Company's mill, on the 8th day of the same month, to load a cargo of lumber under the charter before referred to; that no part of such cargo was delivered to her until May 20, 1902; that thereafter lumber was delivered to her in quantity less than 40,000 feet per working day, and by reason of the delivery of such limited quantity she was not fully laden until July 9, 1902. The libel also alleges that the charterer was under obligation to deliver to the vessel a reasonable quantity of lumber from working day to working day, until she was loaded, and that by custom and usage of the lumber trade at Puget Sound 40,000 feet board measure per working day was deemed a reasonable quantity to be placed on board a vessel in the absence of a contrary agreement, and that the Mahukona could have received and stowed that quantity, and was ready and willing so to do; that by reason of the failure of the charterer to deliver such reasonable quantity the vessel was delayed 33 running days beyond the time that would have been occupied in loading her at the rate of 40,000 feet per day.

The answer of the Charles Nelson Company, charterer and claimant, admits the execution of the charter party as set forth in the libel, and then proceeds to state three separate defenses: (1) It is denied that the Mahukona was entitled to receive 40,000 feet of lumber board measure upon each working day, or that 40,000 feet of lumber board measure was a reasonable quantity of lumber to be furnished her each working day, under the circumstances existing at the time the vessel arrived at Puget Sound. (2) It is alleged that, the Mahukona not having arrived at Puget Sound within a reasonable time, the contract of charter mentioned in the libel was canceled by mutual consent, and it was then agreed that the vessel should be loaded under the terms of the original contract, with the additional provision that she should wait at least 30 days before commencing to load, and then receive her cargo as the same was manufactured by said mill, and that such cargo was furnished to her as fast as the same was manufactured. (3) The answer further alleges that, at the time the contract set out in the libel was entered into, the Mahukona was on a voyage from the Philippine Islands to the port of Everett, which should have been completed within 60 days from the date of leaving the Philippine Islands; that she did not arrive at Everett within a reasonable time thereafter, and was posted at the Merchants' Exchange in the city and county of San Francisco as lost; that the claimant believed the vessel was lost, and thereupon procured another vessel to take the cargo then at Everett awaiting the arrival of the Mahukona; that when she arrived at Everett the mill to which she was dispatched had no lumber on hand and was shut down to make necessary repairs; that the charterer thereafter with due diligence caused sufficient lumber to be manufactured to

furnish a cargo for her, and the same was furnished to the vessel within a reasonable time under the circumstances then existing.

1. The first defense may be disposed of in a few words. The evidence shows that in loading a vessel like the Mahukona with lumber 40,000 feet board measure would be a reasonable quantity for her to receive each working day. This quantity was not furnished the vessel, and in consequence there was delay in taking on her cargo. This conclusion leads to a consideration of the question whether the vessel was loaded under the modified contract referred to in the answer. It appears that at the time the contract of charter set forth in the libel was made the Mahukona was on the ocean, bound on a voyage from Zamboango, Philippine Islands, to some port on Puget Sound. She was expected to arrive about March 7, 1902, and a full cargo was provided for her by the charterer, ready for delivery at that date; but the voyage was protracted by storms and adverse winds, without fault of the vessel, and she did not arrive at Everett, the port where, under the charter, she was to receive her cargo, until May 6, 1902. In the meantime, about 10 days before her arrival at that port, the cargo with which the charterer intended to load her, was shipped upon another vessel. This was done because the owner of the mill at which the lumber was manufactured insisted upon its being removed from the mill wharf without further delay. It also appears that when this cargo was sent forward there was some anxiety felt for the Mahukona's safety on account of her being so long overdue. May 8, 1902, the vessel was by direction of the charterer placed alongside of the wharf of the Weyerhauser Timber Company's mill for the purpose of taking on her cargo. The contention of the claimant is that this direction was not given until after the original contract of charter had been modified, so as to provide that the vessel was to wait at least 30 days before commencing to load, and then to receive her cargo as the same was manufactured by the mill.

After a full consideration of the evidence, my conclusion is that the contract was not so modified. Certainly there was no express agreement to that effect, nor do I think the same can be implied from the circumstances surrounding the parties, at the time of the Mahukona's arrival at Everett. The evidence does show that the claimant desired to be relieved of its obligation to load the vessel, under the charter referred to in the libel, and offered her another charter to carry a cargo of lumber from Gray's Harbor to some port in South Africa. This offer was not accepted. The claimant also requested libelant's agents at San Francisco to secure other employment for the vessel if they could, and, acting upon such request, they made some effort to do so, but did not succeed, and the claimant was notified that the vessel must be loaded under the original charter. It is true, libelant's agents were then informed by the charterer that there might be some delay in loading the vessel, as the cargo intended for her had already been shipped, but this notice would not of itself relieve the charterer of its obligation to furnish a cargo in accordance with the terms of the prior contract of charter, or justify the court, under the particular circumstances of this case, in finding that there was an implied agreement on the part of the libelant that such contract should

be modified in any respect, or that the Mahukona should wait 30 days before commencing to load, and thereafter was to receive her cargo only as fast as the same was manufactured at the mill. The contract of charter set out in the libel was in full force when the vessel arrived at Everett, and there was not at that time any repudiation of its obligations by the charterer. Under such circumstances it is not reasonable to believe that libelant, without any new or valuable consideration therefor, consented to such a radical modification of its terms as is now contended for by claimant.

2. It is lastly contended that the Mahukona was in fact given reasonable dispatch, in view of the particular circumstances existing at the time of her arrival at Everett. The facts upon which this contention is based are: That the vessel was 60 days overdue when she reached Everett; that by reason thereof the cargo which had been provided for her had gone forward on another vessel; that the Weyerhauser Timber Company's mill, to which the charterer directed her to proceed for the purpose of taking on her cargo, was shut down for repairs at the time, and had only about 200,000 feet of lumber on the wharf ready for delivery; that this mill did not have on hand logs of the length required to manufacture the lumber which the charterer desired her to carry; that there was difficulty in obtaining such logs, and in addition to this, while the cargo was being manufactured, the mill was compelled to shut down from time to time for the purpose of making necessary repairs; that the delay in loading the vessel was due to these causes. As the vessel was in fact loaded under the contract of charter alleged in the libel, it becomes necessary, in the decision of the question presented by this defense, to consider what obligations were imposed upon the parties by this contract. The contract contained no stipulation for lay days, and fixed no time within which the vessel was to arrive and be ready to receive her cargo; nor was there any provision therein that she was to be loaded at any particular mill, or that her cargo was to consist of lumber of any specific dimensions. The obligations of the respective parties under such a contract are clearly and accurately stated in the following sections of Carver's Carriage by Sea (4th Ed.):

"Sec. 248. The ship owner is to bring his ship to the agreed port of loading, and to the proper place in that port for taking in the agreed cargo. That is his undertaking. On the other hand, the charterer undertakes that when she has got to the proper place he will provide her with a cargo, in accordance with the charter party. That is an absolute undertaking on his part, and it must be performed in the proper manner and without improper delay."

"Sec. 252. In the absence of express qualifications, the undertaking of the charterer to supply a cargo is absolute. And further, he undertakes absolutely that the cargo shall be ready at the place at which the loading is agreed to be done. The charter party does not usually deal with the manner in which the charterer is to get the cargo; it assumes that he has it in readiness at the port. Any difficulty that may arise in bringing it there is outside the contract, and cannot be a matter of excuse in estimating whether proper despatch has been used, unless it is covered by an express stipulation."

My attention has not been called to any well-considered case in which a different rule is stated. Donnell v. Amoskeag Mfg. Co., 118 Fed. 10, 55 C. C. A. 178, cited by the claimant, turned upon the construction given to a particular provision of a charter party, in which

it was provided that the vessel should report to a certain coal company in Baltimore, and be loaded by it "in turn." In the decision of that case, the court said:

"In view of the stipulation that the vessel should report to the Consolidated Coal Company, and, as the charter party says, be 'loaded by them,' the agreed place of loading was, by implication, at its docks or piers, and the time required for loading must be justly and reasonably determined with reference to the usual facilities of the corporation in that respect. * * * The peculiarity of this charter party, in its reference to the Consolidated Coal Company, entirely distinguishes this case from Adams v. Packet Co., 5 C. B. (N. S.) 492, so much relied on by the vessel, where the strict rule is applied that, when a ship is to be loaded at a coal port named generally, the charterer cannot ordinarily excuse himself for not having a cargo in readiness."

The principle upon which that case was decided is a familiar one, and is thus stated in section 254, Carver's Carriage by Sea:

"On the other hand, the charterer cannot be assumed to have the cargo ready if it is expressly to be provided from a particular place, and the charter has been made in view of circumstances by which, as the parties know, the procuring of a cargo from that place may be delayed. And if, in such a case, no arrangement is made as to the time in which the loading is to be done, the charterer will be allowed a reasonable time for getting the cargo, having regard to the known sources of delay."

But the contract of charter in this case did not stipulate that the vessel should be loaded at the mill where she was finally directed by the charterer to go for her cargo; nor was it within the contemplation of the parties when the charter was made, that the Mahukona should, upon her arrival at Everett, wait for her cargo until the same could be manufactured, if by so doing she would not receive reasonable dispatch.

The Empire Transportation Co. v. Philadelphia & Railroad Coal & Iron Co., 77 Fed. 925, 23 C. C. A. 564, 35 L. R. A. 623, Fulton v. Blake, Fed. Cas. No. 5,153, and Marshall v. McNear (D. C.) 121 Fed. 428, cited by claimant, which in effect hold that a contract to load or discharge a ship within a reasonable time, is to be construed as an agreement to load or discharge with reasonable diligence in view of existing circumstances, are not in point, because what shall be deemed a reasonable time or reasonable diligence must always be a question of fact, to be determined by the particular circumstances of each case; and, as was said in Empire Transportation Co. v. Philadelphia & R. Coal & Iron Co., 77 Fed. 925, 23 C. C. A. 564, 35 L. R. A. 623:

"Our reason teaches that the time that is reasonable under ordinary circumstances—that is, customary time—is always unreasonable under extraordinary circumstances."

But the rule of reasonable diligence, when that is all that is called for by the contract, is not applicable to a contract of charter by which the charterer has bound himself to furnish a cargo and have it ready for delivery to the vessel. This distinction is noticed in section 617 of Carver's Carriage by Sea, in which that author says:

"But though the charterer, where no time is fixed for loading, does not come under any obligation to have the work completed in any particular time, and is excused if the work is delayed by causes beyond his control, that is true only of the actual work of loading or unloading. Unless expressly excused,

the charterer is bound to be ready to proceed with the work without delay. The cargo must be ready at the proper place for loading."

It necessarily follows, from what has been said, that the charterer was in default in not having a cargo ready for delivery so as to give the vessel reasonable dispatch. Its default in this respect is not excused by the fact that the ship was long overdue when she reached the port of Everett. The delay was not caused by the fault of the vessel, but by adverse winds; and her arrival at the port where she was to take on cargo, though tardy, was not so long delayed as to frustrate the object of the voyage for which she was chartered. Upon this state of facts, the charter remained in force, and the charterer was not released from its obligation to furnish the vessel with a cargo when she was ready to receive it, and the language of Chief Justice Taney, in Hall et al. v. Hurlbut, Taney, 589, Fed. Cas. No. 5,936, discussing the implied obligation of the parties under a charter similar to that under consideration here, may be quoted as a correct statement of the law applicable to the facts of this case:

"The written contract contains no stipulation on their [ship-owners] part that the vessel shall arrive at or before a particular day; the law implies no other condition than that reasonable and proper exertions shall be made to perform the voyages contemplated by the charter party, as speedily as practicable; and the shipper takes the risk of delay or detention, by any superior force which the vessel could not resist or overcome; whether it be embargo by the government, or a storm on the ocean."

Let a decree be entered in favor of the libelant; the case to be referred to the commissioner to ascertain and report the amount of damages sustained by libelant.