## THE LEVI W. OSTRANDER.

### HIND, ROLPH & CO. et al. v. OSTRANDER.

(Circuit Court of Appeals, Ninth Circuit. July 6, 1920. Rehearing Denied October 18, 1920.)

#### No. 3426.

1. Shipping ⬅175—Rule is reasonable diligence by charterer in loading is sufficient.

In the absence of a provision fixing lay days, a charterer is required only to load with reasonable diligence, to be determined by the conditions which affect the work of loading; but the rule of reasonable diligence applies only to the actual loading, and does not excuse for failure to have a cargo ready to load.

2. Shipping ⬅178—Charter; delay in furnishing cargo not excused by strikes.

A charterer *held* not excused for failure to furnish a cargo of lumber on time because of a charter provision excepting strikes or any other hindrances beyond the control of either party, where, although there were strikes after the contract was made, they ceased to affect the production of the mills more than a month before the time for loading.

3. Shipping ⬅175—Demurrage not claimable until ship is at loading place.

Before demurrage can be claimed, the ship must be at the place of loading contemplated by the charter party, unless prevented through active fault of the charterer.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit in admiralty by H. F. Ostrander against Hind, Rolph & Co., a copartnership, and cargo of lumber loaded in the schooner Levi W. Ostrander. Decree for libelant, from which both parties appeal. Affirmed.

On May 15, 1917, the appellee, as agent for the owners of a schooner then building at Tacoma, Wash., entered into a contract of charter party with Hind, Rolph & Co. of San Francisco. The charter party provided that the schooner should proceed from the yard where it was being constructed "direct in ballast to a loading place on Puget Sound to be designated by charterers

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

prior to June 30, 1917, under this charter," and it recited "that said party of the first part [the appellee] agrees on the freighting and chartering of the whole of said vessel * * * (civil commotions, floods, fires, strikes, lockout, accidents on railways, and/or docks and/or wharves, or any other hindrances beyond the control of either party to his agreement, or their agents, always mutually excepted) unto said party of the second part, for a voyage from a usual safe loading place on Puget Sound (Washington), as ordered by charterers or their agents to one port in South Africa. * * * For each and every day's detention by default of said party of the second part, or their agents, two hundred and fifty dollars ($250.00) per day shall be paid day by day, by said party of the second part or their agents, to said party of the first part, or agent. * * * Should vessel not have arrived at port of loading (as above) on or before 12 o'clock, noon, of the 31st day of August, 1917, charterers to have the option of cancelling or maintaining this charter, on arrival of vessel. Lay days not to commence before 1st day of July, 1917, unless at charterers' option."

On July 2, while the schooner was still in course of construction, Hind, Rolph & Co. designated Mukilteo and Port Angeles as loading ports. On August 13 they received from the appellee a dispatch saying, "Schooner will be ready for cargo by August 25." But it was not until October 13 that the vessel left the yards in tow of a tug and proceeded to her loading place at a wharf of the Puget Sound Mill & Timber Company at Port Angeles, where she arrived on October 14. On that day the master gave notice to the mill that the vessel was ready to load. On October 18 loading commenced. The full cargo consisted of 1,750,000 feet. On November 24, the schooner had completed loading. During the period of loading strikes in the logging camps and the mills hindered and delayed the procuring and sawing of lumber. After the vessel was loaded, she was detained by the appellee on account of the refusal of Hind, Rolph & Co. to pay his demurrage bill.

On November 30 the appellee filed a libel for demurrage and attached the cargo. The charterer filed a bond to secure the release of the cargo, but for other reasons the schooner was detained until December 26, when she sailed from Port Angeles. The demurrage claimed by the appellee was $250 per day for four periods: First, from August 25 to October 13, 49 days; second, from October 13 to November 24, 27 days (after deducting 13 lay days) ; third, for 5 days after November 24; fourth, for each day's detention after November 30, the date of filing the libel. The court below denied demurrage from August 25 to October 13, awarded demurrage from October 15 to December 14, less 14 lay days, not including Sundays, leaving 45 days, at $250 per day, in the total sum of $11,250. The appellants appeal from the award of demurrage and the appellee appeals from the denial of demurrage for the period prior to October 15.

Andros & Hengstler and Louis T. Hengstler, all of San Francisco, Cal., for appellants and cross-appellees.

Chadwick, McMicken, Ramsey & Rupp, of Seattle, Wash., for appellee and cross-appellant.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). We find no ground to disturb the conclusion of the trial court as to the appellee's claim for demurrage from and after October 15. The appellants contend that they should not in any event be charged with lay days before October 18, for the reason that the master was instructed by the appellee not to load before that day. The contention is not sustained by the evidence. On October 14, on the schooner's arrival at Port Angeles, the master delivered to the Puget Sound Mills & Timber Company, the charterers' representative, a letter stating

that the master was ready to receive cargo, and containing notice that demurrage would be claimed for all  the time during which the charterers had failed to furnish cargo.  The same day the mill company telegraphed the Charles Nelson Company, a San Francisco corporation which controlled the action of the mill company, stating that the master had served notice that lay days would commence August 25, and that the mill company had refused to accept notice or to furnish cargo.  On October 15 the Charles Nelson Company answered by telegraph, instructing the mill to advise the master that on account of strike conditions—

"you are short of logs suitable for this cargo, and that you are doing the best you can and will agree to proceed with cargo as rapidly as possible, with specific understanding that no demurrage will be claimed when loading completed."

On October 15 the mill company returned to the master his notice of readiness to receive cargo, saying:

"Notice states lay days will commence from August 25th. You cannot expect us to accept such a notice, when you did not arrive at our dock until October 14, 1917.  Further, we will not accept any notice at any time in regard to the commencement of lay days. * * * Should you, however, wish to commence loading, you may do so, providing you waive all claim for demurrage."

The appellee on the same day telegraphed Hind, Rolph & Co. the contents of the mill company's letter, and added:

"Unless cargo furnished without further delay I will consider you to have abandoned charter, and I will employ vessel in other service, and will hold you for demurrage to date."

The same day Hind, Rolph & Co. telegraphed the appellee, saying:

"Mill has part of cargo ready, and will deliver this to master for loading at once; also will deliver balance as fast as strike conditions permit, but mill refuses to recognize your claim for demurrage. * * * We wish it distinctly understood that we are not abandoning charter."

This was received by the appellee on the morning of the 16th.  The Charles Nelson Company thereupon wired the mill company, directing it to give the master a letter, stating:

"He may commence loading now, and you will furnish cargo as rapidly as possible under existing conditions; but when he has completed loading you will dispute any claim he may make for demurrage."

The mill company gave the master a letter in compliance with the instructions so given it by the Charles Nelson Company.  The master replied on October 16 that he had orders from the owners in Seattle to await instructions before commencing to load.  In the afternoon of the same day the appellee instructed the master to notify the mill company:

"That you will now receive cargo as offered, but without prejudice to any claim for demurrage we may have against Hind, Rolph & Co."

At 6 p. m. of the 16th, the appellee wired the master, directing him to point out to the mill company that the charter was with Hind, Rolph & Co., and not with the mill company:

"We will look to the former for demurrage, and therefore cannot discuss the question of demurrage with the mill as principal."

The master on October 17 delivered to the mill company a letter, notifying it that the schooner—

"will be ready to receive cargo today at 1 p. m. I also agree under existing conditions to sign a demurrage release to your mill upon completion of cargo."

This correspondence clearly shows that the master of the schooner gave proper notice on October 14 that he was ready to receive cargo, and that the delay was occasioned by the appellants and their representative, the mill company, in refusing to furnish cargo unless their illegal demand was complied with, and it explains the nature of the master's readiness to sign a demurrage release to the mill upon the completion of the cargo. Such a release, as was pointed out in the correspondence, was not a release of Hind, Rolph & Co. Durchman v. Dunn (D. C.) 101 Fed. 606, affirmed 106 Fed. 950, 46 C. C. A. 62; Holman v. Peruvian Nitrate Co., 5 Sc. Sess. C. 4th Ser. 657. The record shows that shortly thereafter the appellee had a conversation with the manager of the mill company and told him that he would still, as he always had, insist upon demurrage being paid.

The appellants rely on the fact that on October 18 the appellee gave the master instructions not to start loading until further orders. The mill company was responsible for this delay. It had refused to deliver the cargo unless the vessel employed the mill company's stevedores, and paid the company in addition thereto 10 per cent. more than the wages of the stevedores. The charter party had provided: "The stevedores, if any, to be employed by the vessel." Hind, Rolph & Co., on learning the facts, wired the appellee that the position taken by the mill is a "very unjust and high-handed procedure," and they offered to assume the payment of the 10 per cent. if necessary, and the Charles Nelson Company thereupon wired to the mill company that the stand taken by the master was legally correct. "Proceed to give vessel cargo."

It is urged that no legal obligation to begin loading matured before October 18, for the reason that no proper surveyor's certificate was tendered by the appellee. The charter party required the appellee to furnish a certificate from a marine surveyor of the San Francisco Board of Underwriters "that she is in proper condition for the voyage." A certificate, which was dated October 13 and signed by a marine surveyor, was delivered to the mill company on October 14. The marine surveyor had made his inspection of the vessel on August 25, but he issued no report on that date. It is said that the certificate was defective for its failure to show the seaworthiness of the vessel on the date when it was delivered. It is sufficient to point to the fact that the certificate was accepted without objection.

[1] The appellants contend that the act of the parties in deleting from the charter party the usual clause fixing lay days indicated their intention to require only that the charterers perform with diligence the work of loading, and that the diligence was to be measured by the con-

ditions under which the work was done. The only reference to lay days in the charter party is the provision that they shall not commence before July 1, "unless at charterers' option." This is coupled with a provision giving to the charterers the option to cancel the charter in case the vessel did not arrive at port of loading by August 31. It is true that, in the absence of a provision fixing lay days, the charterer is required only to load with due diligence, and that the diligence is to be determined by the conditions which affect the work of loading. For instance, a strike of laborers engaged in loading may be of such a nature as to excuse the charterer for delay. Empire Transp. Co. v. Philadelphia & R. Coal & Iron Co., 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623. But no such conditions attended the work of loading in the present case. There was no strike of stevedores, and no impediment to a diligent delivery of the cargo from the mill. The court below found that the work of loading should have been completed in 14 days, and we find no ground to question that conclusion. The rule of reasonable diligence applies only to the actual loading, and does not excuse for a failure to have a cargo ready to load. Carver on Carriage by Sea (6th Ed.) § 617.

[2] The charterers covenanted to furnish the vessel at a designated loading place a full cargo of sawn lumber. As early as May 26 they had contracted for the purchase of the lumber, and on that date they notified the appellee that, in order to arrange for dispatch in accordance with the charter party, they had been compelled to agree that the vessel would load at two mills. The appellants contend that their delay in furnishing the cargo was excused by the stipulated exceptions, which included strikes, lockouts, accidents on railways, docks, or wharves, "or any other hindrances beyond the control of either party." At the time when the contract was made there were no strikes in logging camps or lumber mills. Such strikes began early in July, and they seriously impeded the production of sawn lumber until after the first week in September, from which date, as the trial court found, the strike did not materially interfere with the output of the mills. These strikes not being in contemplation at the time of making the contract, they did not create a situation which should be deemed to have been taken into consideration by the contracting parties, and the decision in Jones v. Greene, 9 Asp. 600, is not applicable here. The court below properly, we think, held that the exceptions did not relieve the charterers from the obligation to furnish a full cargo. 1,600 Tons Nitrate of Soda v. McLeod, 61 Fed. 849, 10 C. C. A. 115; Schooner Mahukona Co. v. 180,000 Feet of Lumber (D. C.) 142 Fed. 578; Sorensen v. Keyser, 52 Fed. 163, 2 C. C. A. 650; The India, 49 Fed. 76, 1 C. C. A. 174; Nichols v. Tremlett, 1 Sprague, 361, Fed. Cas. No. 10,247; Dampskibsselskabet Danmark v. Paulsen & Co. [1913] Sess. Cas. 1043.

[3] The cross-appeal brings in question the denial of demurrage for the period between August 25 and October 15. The court below ruled that the notice of August 13 that the vessel would be ready August 25 was not sufficient to cause the lay days to begin to run. We think the ruling was clearly correct. The charter party provided

that the vessel, when built, should proceed in ballast to a loading place on Puget Sound to be designated by the charterers. On July 2 the charterers designated a certain mill at Mukilteo and a certain mill at Port Angeles. The notice of August 13, given while the vessel was in course of construction at Tacoma, announced that she would be ready for cargo by August 25. On August 16, 1917, the charterers wrote to the shipowner: "If the vessel insists on going to the mill, she may go to Port Angeles." She did not go to the mill at Port Angeles until October 14. It is contended that her failure to go there sooner was excused by the fact that the charterers had said that no cargo could be furnished in the meantime. But that was no excuse. The rule is well settled that, before demurrage can be claimed, the ship must be at the place of loading contemplated by the charter party. Anderson v. Moore, 179 Fed. 68, 102 C. C. A. 362, and cases there cited; Hutchinson on American Law of Carriers, § 848; W. K. Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 402, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126. In 36 Cyc. 365, it is said:

"Where it is provided that the vessel shall proceed to a certain specified wharf or jetty, or one to be selected by the charterer, the arrival of the ship at that wharf or jetty is a condition precedent to the commencement of the running of the time, unless she is prevented from reaching the designated place through the active fault of the charterer."

See, also, In re 2,098 Tons of Coal, 135 Fed. 317, 67 C. C. A. 671, and Aktieselskabet Inglewood v. Millar's Karri et al., 9 Asp. 411.

Here there was no active fault on the part of the charterers, and no obstacle was interposed by them to prevent the vessel from proceeding to the designated loading place. There is no more cause for saying that the charterers' statement that they had no cargo ready was a waiver of any provision of the charter party than there is for saying that the shipowner waived his right to demand a cargo by his failure to take his vessel promptly to the place of loading.

The decree is affirmed.