BALES OF COTTON, (STEPHENS v.) See Case No. 13,366.

BALES OF TOBACCO, (UNITED STATES v.) See Case No. 14,505.

---

## Case No. 807.

### BALFOUR et al. v. WILKINS et al.

### The BENLEDI.

[5 Sawy. 429.] [1]

District Court, D. Oregon. March 11, 1879.

SHIPPING — CHARTER PARTY — CONSTRUCTION OF RAINY DAY CLAUSE — DEMURRAGE — BILLS OF LADING.

1. The phrase "rainy day" being of itself indefinite and uncertain, the sense in which it was used in a particular contract may, therefore, be shown by the surrounding circumstances, including the usage of the particular port or trade to which the contract relates.

2. A charter party provided that the charterers should have thirty working days, not counting "rainy days," in which to load a vessel with grain at Portland, Oregon: Held, that the phrase "rainy days" was intended to apply only to the days on which the rainfall was such as to prevent the loading of the vessel with safety and convenience—the actual facilities of the port for so doing, being considered.

3. A contract entered into in Liverpool to load a vessel with grain in Portland, Oregon, is, in contemplation of law, made at the latter place, and, therefore, the condition and conveniences of such port for loading vessels with grain, or the established usage thereof upon that subject, may be shown to explain the meaning and use of dubious and uncertain phrases in the same, as, for instance, "rainy days."

4. The person to whom a bill of lading of a cargo is made, or the indorsee thereof, has the legal property in the same free from the lien for demurrage; and, therefore, the owners of a vessel with an overdue claim for demurrage against the charterers, for which, by the terms of the charter party, they have a lien upon the cargo, are not bound to sign unqualified bills of lading to the charterers for such cargo, until such claim for demurrage is satisfied; and if such vessel is detained in port for want of a clearance, which, by the terms of the charter party, the charterers were to obtain, but did not for want of the bills of lading, such detention is, nevertheless, the fault of the charterers in not paying the demurrage or accepting bills of lading subject to the same, and, therefore, they are liable to the owners for the damage arising from such detention.

[In admiralty. Libel in personam by Balfour, Guthrie & Co. against Wilkins & Co.

[1] [Reported by L. S. B. Sawyer. Esq., and here reprinted by permission.]

and J. M. ten Bosch, and in rem against the cargo of the Benledi, for demurrage and for damages for detention after loading. Decree for libelants.]

Ellis G. Hughes, for libelants.,
William H. Effinger, for defendants.

DEADY, District Judge. This is a suit in rem and personam, brought by certain parties constituting the firm of Balfour, Guthrie & Co., doing business in this city as the agents of Watson Brothers, of Glasgow, against certain persons constituting the firm of Wilkins & Co., of San Francisco, and J. M. ten Bosch, of this city, and the cargo loaded here on the British ship Benledi, for eight hundred and fifty-two dollars and sixty cents for demurrage and three hundred and forty-one dollars and four cents for damages for detention of said vessel after she was loaded.

The admitted facts in the case are as follows: On April 27, 1878, the ship Benledi, owned by Watson Brothers aforesaid, was duly chartered to the defendants, Wilkins & Co., for a voyage from the port of Portland, Oregon, to a port in the United Kingdom, or on the continent between Havre and Hamburg, the charterers to load said vessel at Portland with a full cargo of wheat or flour or other lawful merchandise to be carried for a specified freight. Among other things, the charter party provided that "the lay days for loading" at Portland should commence twenty-four hours after the discharge of inward cargo, and the report of the master that he was ready to receive cargo, and continue for "thirty working days to load," excepting "rainy days," which were "not to be counted as lay days in loading;" that, "for each and every day's detention over the specified number of lay days, four pence per register ton per day, day by day, shall be paid by the" charterers to the owners or their agents as demurrage; that the cargo should be stowed under the direction of the master, but the vessel should employ the stevedores named by the charterers, at the customary rates; and that the owners should have a lien upon the cargo for all freight and demurrage due under the charter party.

The Benledi arrived at Portland in ballast, on September 17, 1878, and on the twenty-fifth of the same month the master reported that he was ready to receive cargo, and the defendant, ten Bosch, acting as the agent of said Wilkins & Co., received said vessel and commenced loading her on October 30, and completed the same on November 11 following. The libellants, as the agent of the owners, claimed that the charterers had detained the vessel ten days beyond the time specified in the charter party and regularly demanded the agreed rate of demurrage therefor, which claim the charterers, by their agent, ten Bosch, denied and refused payment of the

same, whereupon the libellants refused to sign the bills of lading for the cargo, unless the demand was paid or stated to be due thereon.

The charter-party provided that the vessel should be cleared in the name of the charterers, but on account of this dispute about the bills of lading, the charterers were unable to file a manifest of the cargo in the custom-house, and thereby the vessel was detained in port four days after she was otherwise ready to go to sea.

The difference between the parties about the demurrage and the bills of lading grew out of the question, whether, of the forty-eight days that elapsed between the time the master gave notice that he was ready to receive cargo and the completion of the loading, there were ten "rainy days" within the meaning of that phrase as used in the charter-party; and upon the correct construction of the clause in which this phrase occurs depends the proper determination of this controversy.

The defendants stand, as they claim, upon the letter of the contract, and insist that a day upon which any rain falls is a "rainy day" within the terms of the contract, and therefore not to be counted as a working lay day. On the other hand, the libellants contend that mere rain-fall does not make a "rainy day" within the meaning and spirit of the agreement, but the rain-fall must be such—the subject-matter, the usage, circumstances and facilities of the port being considered—as prevents the safe and convenient loading of such cargo.

The evidence shows that there was rain-fall on two days in September, thirteen days in October, and two days in November—in all seventeen days; and that the fall ranged from 1.100 of an inch to 87.100 per day, and averaged about 26.100 or a quarter of an inch. It also appears that during all the time between September 25 and November 11, wheat was loaded by the leading shippers in this port, and it does not appear that any one who had the wheat on hand ever declined to load it on account of the weather, but the reasonable inference is to the contrary.

On the trial, the libellants offered and were permitted to introduce, subject to further argument and objection, evidence from which it appears that it is the known and established usage of this port to load wheat on rainy days, unless the rain-fall is very heavy and accompanied by a driving wind, which very seldom occurs; and that the wharves are so constructed and the facilities for loading are such, that wheat can be as safely and conveniently put on board a vessel here in ordinary wet weather as in dry. Indeed, Mr. C. H. Lewis, a leading and long-established shipper and loader, testified that in his experience, he did not remember being prevented from loading by rain but on one occasion.

Different from this, but not contrary to it

or affecting the fact of the usage, the evidence introduced by the defendants showed that during the past four years there were a few instances in which parties, who did not have the wheat to put on board, claimed under charter parties similar to this, that days on which rain fell were not to be counted as working days, and such claim was either submitted to or compromised. But it is not pretended that in any instance a shipper declined to deliver wheat or a master to receive it really on account of the rainfall.

This contract, though made in Liverpool, was to be performed, so far as this controversy is concerned, in Portland, and, therefore, the presumption is, that the parties to it contracted with reference to the laws, usages and general circumstances and condition of this port, including its climate and modes and facilities of discharging and receiving cargo. In other words, the contract, so far as it was to be performed here is considered to have been made here. Andrews v. Pond, 13 Pet. [38 U. S.] 77; Naylor v. Ballzell, [Case No. 10,061;] Story, Confl. Laws, § 280.

Assuming, then, as we must, that this contract, as to loading the Benledi, was made here, is it competent to prove a usage in this port to load on days of ordinary rainfall, to ascertain the intention of the parties to the agreement so far as this "rainy day" clause is concerned? The decisions of the courts upon this subject have not been uniform, but the leaning of the later cases is to limit the office of usage, and with that tendency I agree.

But cases do and must arise, where the intention of parties to a contract could not be understood unless proof was allowed of the usage on the subject with reference to which it was made. And this is especially so in the case of mercantile contracts, and particularly the one styled a charter-party. The rule is laid down in Abb. Shipp. 250, 274, that the construction of a charter party "should be liberal, agreeable to the real intention of the parties, and conformable to the usage of trade in general, and of the particular trade to which the contract relates;" and this is cited with approbation by the supreme court in Raymond v. Tyson, 17 How. [58 U. S.] 59, in which Mr. Justice Wayne says: "That a charter party is an informal instrument as often as otherwise, having inaccurate clauses, and on this account they must have a liberal construction, such as mercantile contracts usually receive, in furtherance of the real intention of the parties and usage of the trade."

In The Reeside, [Case No. 11,657,] Mr. Justice Story says: "The true and appropriate office of a usage or custom is, to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of their contracts, arising, not from express stipulations, but from mere implications and presumptions, and acts of a doubtful and equivocal character. It may also be admitted to ascertain the true meaning of a particular word or of particular words in a given instrument, when the word or words have various senses, some common, some qualified, and some technical, according to the subject-matter to which they are applied." See, also, U. S. v. Robinson, [Case No. 16,177;] 13 Wall. [80 U. S.] 363.

Finally, in the well-considered case of Barnard v. Kellogg, 10 Wall. [77 U. S.] 390, the supreme court lays down the rule: "The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or in parol, which could not be done without the aid of this extrinsic evidence. It does not go beyond this, and is used as a mode of interpretation, on the theory that the parties knew of its existence, and contracted with reference to it. It is often employed to explain words or phrases in a contract of doubtful signification, or which may be understood in different senses according to the subject-matter to which they are applied. But if it be inconsistent with the contract, or expressly or by necessary implication contradicts it, it cannot be received in evidence to affect it."

The phrase "rainy day" has no definite and certain meaning. It may be used and understood in many senses. In common parlance, it varies in signification from the day with light, passing April showers to the steady and strong pourdown of an Oregon December. Worcester defines "rainy" as follows: "Abounding in rain; showery; wet;" and Webster's definition is the same. But the definition, while it fixes some limit to the signification of the term, as that a rainy day is a wet one, and therefore not a dry one, does not free the matter from the uncertainty which is inherent in the expression.

Taken literally, in my judgment, the phrase "rainy day" means nothing less than a day of rain—a day on which rain falls during every moment of the period. Otherwise, the day is not wholly a rainy day but only partly so. Strictly speaking, as well say that a few minutes of sunshine make a fair day as that a shower makes a rainy one. Colloquially, it may be often used to describe a day upon which at least a moderate rainfall occurs during the greater portion of the time.

During a period of six years from 1873 to 1878 inclusive, as appears from the record of observations in the office of the signal service in this city, the days upon which any rain fell numbered from one hundred and fifty-one to one hundred and seventy-two a year, the average being one hundred and sixty-two days; and the total rain-fall during the same period ranged from 46.17 to 60.08 inches a year, the average being 52.96 inches;

while the average fall per day for each of such years varied from 0.28 to 0.34 inches, the average fall per day for the whole period being 0.33 inches or one third of an inch. The greatest rain-fall on any one day in such years varied from 1.66 to 3.05 inches, and the average of such days was 2.33 inches.

Judged by these figures the rain-fall upon the days in question was relatively very light, it being only one quarter of an inch per day as against one third of an inch for the past six years, which latter computation includes many days—fifteen in 1878, upon which the rain-fall was inappreciable or too small to be measured. Yet, the fact is, the phrase when used abstractly and without reference to the surrounding circumstances is altogether indefinite and uncertain. To say simply that a day is a rainy one is almost as vague an expression as that a thing is as big as a piece of chalk or as long as a string.

A contract to plow, ditch or cut wood, "rainy days" excepted, would not be understood or construed as would a contract to harvest grain, "rainy days" excepted. Reference being had to the subject-matter, it would be manifest that the parties had not the same degree of rain-fall in view in making the last contract as the others, because they could be conveniently performed in weather in which the moisture would make it unsafe and unfit to harvest. In short, the phrase is one which may be used in different senses according to the nature of the subject-matter concerning which it is applied, and therefore may, according to the uniform doctrine of the authorities, be explained by usage where one exists. 1 Greenl. Ev. § 292. The established usage in this port being to load wheat on all such days as rain fell upon, between September 25 and November 11, 1878, and it being presumed that the parties used this phrase in the contract with a knowledge of this usage, it follows that within the meaning of such contract and the intention of the parties thereto, there were no rainy days within the time allowed for loading the Benledi, nor in fact during any of the time she was in port.

But I think the same conclusion may be reached, without invoking this usage, as such. The charter is a written contract which the court must construe. If it contains any vague or dubious terms or provisions, the court in ascertaining what the parties understood and intended thereby may consider the contract in the light of the surrounding circumstances. 1 Greenl. Ev. § 277. As declared in section 686 of the Oregon Civil Code: "For the proper construction of an instrument the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge may be placed in the position of those whose language he is to interpret."

This contract was made in Liverpool to be performed in Oregon. By it the charterers agreed to load the Benledi with wheat at Portland, the vessel to lay here for that purpose at the expense of the owners, for thirty working days, that is thirty days, excluding holidays, and longer if need be, at the expense of the charterers. But if after the working days commenced "rainy days" should occur, they were not to be counted. Now what was the object of this exception. Certainly not to enable the charterers to compel this vessel to lie here every day that any rain fell between September and May, six months it may be, at the expense of the owners, while they were waiting for a fall in the price of wheat to purchase a cargo cheaply. The only object in giving thirty working lay days to the charterers was to enable them to purchase a cargo and get it on board and a rainy day which would materially interfere with this purpose was to be excepted therefrom. Of course, the rain fall could not interfere with the purchase of cargo and therefore it can only be considered as affecting the loading of the same, supposing the charterer had the wheat on hand.

The burden of proof is upon the charterer to show that there were such days. The parties are presumed to have had in mind the known condition of things at this port when the contract was made, and contracted with reference to it; for instance, that there were covered wharves here from which cargo could be, and commonly was, safely and conveniently loaded in all ordinary rainy weather. The phrase "rainy day," then, as used in this contract, and as both parties to it must have understood it, means a day on which cargo could not be safely and conveniently loaded at this port.

Contracts must have a reasonable construction; and when they contain ambiguous or doubtful expressions these should be taken in that sense which best agrees with the general purpose of the contract. Chit. Cont. 74.

The much greater portion of the yearly mean number of days—one hundred and sixty-two, or over five months—on which some rain fell in the last six years, occurred in the usual season for shipping wheat from Portland for foreign ports. Under the construction claimed for this contract by the defendants, it would be in the power of the charterers in such a charter-party to detain a vessel here at the expense of the owners, from three to four months beyond the usual lay days, or the time deemed necessary for purchasing a cargo and putting it on board, simply because they had no cargo to deliver, and desired to wait for a more favorable market to purchase in. Now nothing is plainer than that the owners did not contemplate any such risk or any such delay as this, and nothing can be more unreasonable than to suppose that the parties to this contract ever intended to make any such one-sided and unjust agreement.

It may not be amiss to notice the fact, as strengthening this conclusion, if there can be any doubt about it, that this charter-party is a long printed formula, composed of disjointed and independent clauses intended for use in any part of the world, and particularly San Francisco, where, until lately at least, on account of the rarity of rain, there were no suitable conveniences for loading grain in wet weather. But the same forms appear to be used for any place, by striking out and inserting clauses to adapt them to the particular port for which they are then intended, and are usually very inaccurate and incomplete, and ought to be construed liberally in support of what appears to have been the real intention of the parties. Raymond v. Tyson, [17 How. (58 U. S.) 59.] Printed formulas are always general in their nature, so as to be used by different contracting parties, for similar subjects, but they do not contain the actual and immediate language of the parties thereto, as in the case of an agreement reduced to writing pro re nata, and therefore are not supposed to express the understanding and intention of the parties with the precision and completeness of a written agreement. 1 Greenl. Ev. § 278. The claim for demurrage must be allowed.

The demand for damages for four days' detention after the cargo was on board, rests upon the right of the libellants to retain the bills of lading until the demand for demurrage was satisfied, or to sign them subject to it, and of this I think there can be no doubt. The legal property in the cargo is in the person to whom the bills of lading are made or indorsed. The Thames, 14 Wall. [81 U. S.] 108; The Vaughan and Telegraph, Id. 266. Had the libellants given Wilkins & Co. clean bills of lading, the latter might have transferred them to third persons at once, as they intended to do, and thereby they would have lost their lien on the cargo for the demurrage. This they were not required to do. The claim for damage is also allowed. The defendants made a counter-claim for two thousand six hundred and nine dollars and thirty-one cents damages. on the ground of being kept out of the use of the money for which they might have disposed of the cargo of the Benledi, but for the withholding of the bills of lading. But as the libellants were justified in detaining the bills, they are not liable therefor.

There must be a decree for the demurrage —eight hundred and fifty-two dollars and sixty cents, with interest from November the eleventh—four months—twenty-eight dollars and forty-one cents, and for the damages for detention at Astoria, three hundred and forty-one dollars and four cents, with interest from November the twenty-fifth—three and one half months — ten dollars and six cents—in all, one thousand two hundred and thirty-two dollars and twenty-one cents, with costs and disbursements.