SCHWANER v. KERR et al.

(District Court, D. Oregon. April 26, 1909.)

No. 4,980.

1. SHIPPING (§ 172*)—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY.

Where a charter party contains no express provision as to the time for loading, the parties are deemed to have contracted with reference to the custom of the port where the vessel is to be laden, which stands as a regulation; but, where the charter party has fixed the number of days and time of their commencement in unequivocal language, usage and custom cannot avail to change or modify its stipulations in that respect.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 569; Dec. Dig. § 172.*]

2. SHIPPING (§ 181*)—DEMURRAGE—LAY DAYS—CONSTRUCTION OF CHARTER PARTY.

A charter party for a steamship to be loaded with wheat for export at the port of Portland, Or., provided that lay days for loading should not count during any time when the supply or bringing by rail to the port of loading of the intended cargo should be delayed by railway accidents or impediments or other hindrances beyond the charterers' control. The grain had been purchased and was stored at interior railroad points. There was a delay of several days beyond the charter time in loading, which the charterers claimed was due to their inability to obtain the forwarding of the grain by the railroads as speedily as demanded. It appeared, however, that, although they did not obtain shipments in as large volume as usual, it was not due to any accidents, or unusual conditions, and that they did in fact during the time the vessel should have been loaded receive more than sufficient to load her, which they shipped in other vessels also under charter to them. *Held*, that the delay was proximately caused by the acts of the charterers themselves, and not to any hindrance beyond their control, within the exception in the charter.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 590; Dec. Dig. § 181.*]

3. SHIPPING (§ 181*)—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY—"RAINY DAYS."

A provision of a charter party, excluding "rainy days" from the lay days for loading a cargo of wheat at Portland, Or., will be construed to exclude only days when by reason of rain and storm the work of loading such cargo with the facilities at that port cannot be safely and conveniently prosecuted; but it is the right of either party to insist on the exclusion of such days, and the charterer may do so even though the loading in fact proceeded.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 590; Dec. Dig. § 181.*

For other definitions, see Words and Phrases, vol. 7, p. 5916.]

4. SHIPPING (§ 181*)—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY—"HOLIDAYS."

A charter party of a vessel to be loaded with grain at Portland, Or., excepted "holidays" from the lay days for loading, and also contained a provision that working days should not count when the shipment of the grain or the loading should be delayed by holidays ecclesiastical or civil, B. & C. Comp. Or. § 3918, makes certain days legal holidays, "and every day appointed by the President of the United States or by the Governor of this state as a day of public fasting, thanksgiving or holiday." The statute, however, imposes no penalties for working on such days. *Held*, that the provision, construed with reference to the statute, included only such holidays as were customarily observed by a cessation of work, that

a day designated by the President for thanksgiving was within the exception, but that a series of days specially designated by the Governor as legal holidays on account of a financial panic were not within the exception.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 590; Dec. Dig. § 181.*

For other definitions, see Words and Phrases, vol. 4, p. 3321.

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

In Admiralty. Suit for demurrage.

Veazie & Veazie, for libelant.

Teal, Minor & Winfree, for respondents.

WOLVERTON, District Judge. By charter party of date October 3, 1907, Kerr, Gifford & Co. chartered of C. Andersen the ship Tiberius, to carry wheat in sacks from Portland to a port in the United Kingdom or on the Continent of Europe; the net register of said ship, according to the charter, being 2,703 tons. By the charter party it is provided (paragraph 8) that:

"Fourteen working lay days (Sundays, holidays, and rainy days, or days on which the Columbia or Willamette rivers are obstructed by ice, so as to prevent navigation by ordinary lighters, not to be counted as lay or working days), to commence twenty-four hours after the inward cargo and or ballast shall have been finally discharged, and the captain has given charterers written notice, accompanied by surveyor's certificate that his vessel is ready to receive cargo, are to be allowed charterers for loading at places as hereinbefore provided."

By section 14 it is agreed that for each and every day's detention or demurrage at the port of loading, by default of the charterers or their agents, four pence per net register ton, or its equivalent, per day, shall be paid day by day, by the said charterers or their agent; and, by paragraph 15, that:

"Lay or working days shall not count at ports of loading, during any time when the supply or loading of stiffening, or the supply or bringing by rail, craft, or otherwise, to port of loading or alongside the vessel, or the loading of the cargo, or intended cargo, or any part thereof, is delayed by the act of God, war, restraint of princes, rulers, or people, force majeure, blockade, quarantine, earthquake, inundations, storms, rain, snow, ice, fire, riots, strikes, lockouts, civil commotions, political disturbances or impediments, holidays (ecclesiastical or civil), cessations or stoppages of labor, epidemics, perils of the seas, railway accidents or impediments, or any other hindrance of whatsoever nature beyond the charterers' control."

The ship Tiberius arrived in port on the 7th day of November, and at 8 o'clock a. m. on the 11th the captain gave notice to the charterers, accompanied by the certificate of a competent surveyor selected by them, that the vessel was ready to take in cargo. Loading, however, was not begun until November 27th, and thence was continued from day to day until December 6th, when her cargo was completed, and she departed on her voyage.

On October 28th the Governor of the state of Oregon issued his proclamation declaring the 29th, 30th, and 31st days of October, and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the 1st and 2d days of November legal holidays, and thereafter issued other proclamations from time to time declaring other days to be legal holidays, comprising all the time that the steamship Tiberius was in the harbor of Portland, excepting December 5th and 6th. The especial reason for the issuing of such proclamations was the peculiar financial condition of the country in banking circles.

This is a proceeding by libel to recover demurrage for the delay of the ship beyond 14 lay days subsequent to 24 hours after the notice was given that the ship was ready for loading.

It is stipulated by the charter party, bringing the material matter into juxtaposition, that lay or working days shall not count at ports of loading during any time when the supply or bringing by rail or craft or otherwise to port of loading, or alongside of the vessel, or the loading of the cargo or intended cargo, or any part thereof, is delayed, by railway accidents or impediments, or other hindrance, of whatsoever nature, beyond the charterers' control. The two members of a committee who were instrumental in having this form of clause introduced into the charter party have testified from the witness stand, in effect, that it was designed for the protection of the shipper and charterers to cover delays incident to shipping grain from the interior by rail, beyond the shipper's or charterers' control. Grain is purchased from first hands in the interior of the country, many miles from the port, where it is stored in warehouses along the lines of railways. Exporters sometimes, in anticipation of their export trade, and sometimes subsequent to their purchases inland, charter vessels for their use to carry such grain abroad from Portland. They expect, however, to assemble the grain at the Portland docks in time to meet the exigencies of their charters. Their calculations in this particular may, however, be frustrated on occasions by unusual and unlooked for occurrences, delaying deliveries by rail, and it is such unforeseen hindrances, beyond the control of the charterer, say the framers of this form of charter party, that the contract was intended to cover, and thereby to excuse the charterers from delays attributable to such causes.

While it might be pertinent for the draftsman of a contract to explain what was intended by specific provisions contained therein, nevertheless the instrument is subject to like rules of construction as those of similar kind, and the intendment must be gathered from the four corners of the paper itself, viewed in the light of the conditions and environment under which it was drawn, and the purposes which, from its reading, it was manifestly designed to subserve. Formerly the rule prevailed that, when a charterer agreed to furnish cargo for a vessel, his obligation imported that he must have it ready for loading when the vessel was ready to receive it; but the rule has been very materially modified, so that it now has adaptability to the custom of the port in which the vessel is to be laden. Of course, if the charter party, by explicit terms, fixes the time for loading, no custom can avail to change its effect; but, if no specific time is designated, then a reasonable time is allowed to be ascertained from the custom of the particular port. So it is as it respects getting the cargo to the ship's side in the absence of any express provision that it must be ready when the ship

is prepared to receive it. The established custom of the port stands as a regulation; the parties to a charter party being deemed to have contracted with reference to the custom.

In Randall v. Sprague, 74 Fed. 247, 21 C. C. A. 334, there being no stipulation respecting loading days, the court observes:

"It is evident that the vessel was chargeable with notice that, by the usage of the port, coal was not stored at Baltimore, but was to be loaded from the cars, so that the usual strict obligation to have the cargo on hand prior to commencing loading did not exist, in all its particulars. It is also plain that the master was chargeable with the understanding that he was to take his turn at the wharf where the vessel was to be loaded."

The doctrine is carried still further if it be agreed that the loading shall be done by a person or corporation engaged in a special industry. In such case, the rule subjects the ship, not only to the custom of the port in the manner of loading, but to the usage of the person or corporation in supplying the cargo or bringing the same to the ship's tackle. Donnell v. Amoskeag Mfg. Co., 118 Fed. 10, 55 C. C. A. 178.

This extension of the doctrine is well illustrated by an English case (Lyle Shipping Co. v. Corporation of Cardiff, 2 Q. B. 638), which was in relation to the unloading of the ship. By the custom of the port, the cargo was to be delivered in wagons of certain specified railroad corporations, and in no other way, and it was held that the cargo owners were reasonably relievable from the charge of negligence where they did their best to obtain the conveyances of a specified company customarily used, into which the cargo was discharged.

The rule is fully discussed, and authoritatively settled, in W. K. Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 402, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126, which is perhaps the most recent expression of the courts upon the subject. On the other hand, however, the rule is inexorable that, where the charter party has fixed, by unequivocal language, the time when loading or the lay days shall commence, usage and custom cannot avail to change or modify the stipulation of the contract in that respect. In such case the parties must abide their agreement, and they cannot be excused unless through appropriate exceptions also provided for in the charter party. Davis v. Wallace, 7 Fed. Cas. No. 3,657; Carbon Slate Co. v. Ennis, 114 Fed. 260, 52 C. C. A. 146; New Ruperra S. S. Co. v. 2,000 Tons of Coal (D. C.) 124 Fed. 937; Schooner Mahukona Co. v. 180,000 Feet of Lumber (D. C.) 142 Fed. 578.

So it is if the shipper has engaged to furnish a cargo, at the ship's tackle, he is bound to the strict performance of his obligation, unless saved by an exception appropriate to his relief. 1,600 Tons of Nitrate of Soda v. McLeod, 61 Fed. 849, 10 C. C. A. 115.

It is strongly urged, as coming especially within the exception, that the charterers were hindered in getting their cargo alongside of the Tiberius by reason of the dilatoriness of the Oregon Railway & Navigation Company in making delivery to them from the interior warehouses, where their grain was on deposit; such grain having been previously purchased. The charterers show that they made repeated and urgent requests of the railroad company to forward their grain more speedily, but were unable to obtain the requisite shipments to

enable them to load the Tiberius within the time specified by the charter party. It appears, however, that the charterers did get considerable quantities of wheat forward; not so great a volume as was usual, but in large proportion thereto. This appears from the railroad company's returns. During the last three days of September and the month of October they received 610 cars, and during November and the first six days of December they received 489 cars, which latter shipments were almost sufficient to load three such vessels as the Tiberius. From November 11th, the time of the ship's arrival and notification of readiness for receiving cargo, to November 27th, inclusive, more than sufficient wheat arrived for her loading, and in the next two days following nearly sufficient arrived to half load her, so that, laying all other considerations aside, there was no hindrance arising from dilatoriness on the part of the railway lines in delivering cargo sufficient to load the Tiberius.

But it is further urged that the charterers had other vessels in port, which were required to be loaded, and that the particular kind of wheat destined to be shipped by the Tiberius did not come forward as was desired. The testimony shows that two other ships, namely, the British Monarch and the Borderer, each of about the same tonnage as the Tiberius, were loaded ahead of her; the charterers assigning as a reason for this that the ships arriving later were chartered to load with a superior quality of wheat to that intended for consignment by the Tiberius, and hence the apparent preference given them. On November 18th the charterers had 6 vessels in port awaiting wheat cargoes, with a capacity of 32,000 tons, and on December 5th they had 10 vessels in port, with a total capacity of 46,500 tons. The Tiberius and 3 others are enumerated in both lists of vessels, yet others loaded out during the month of November—one in particular that I mention, the British Monarch. Such were the conditions existing while the Tiberius was awaiting her cargo.

Now, if it be conceded that any hindrance, in its broadest sense beyond the control of the charterers, is within the intendment of the charter party to prevent the running of lay days, it does not appear that the delay in the car service was the proximate cause of the ship not having its requisite cargo in due time. It cannot be that a cause of delay, springing from another cause which arose by reason of the charterers' own acts, will suffice to postpone the lay days. Such a cause of delay could not be said to be beyond the charterers' control, for they might have chartered fewer vessels, and thus lessened the demand for cargo, so that the cargo that was delivered would have fully met the demand for shipping abroad. The charterers surely could not complain if they had brought into the harbor of Portland twice the amount of shipping that they could supply cargo for from the interior, under the usual course of delivery by the railroad, for they themselves would be to blame for the condition. They ought to have foreseen the result.

While the condition in the present case is not in that extreme, yet the charterers had a great supply of vessels in port, which required as large an amount or even more grain for loading than the usual

deliveries by rail would bring to the dock, so that a slight falling off was bound to leave some vessel or vessels without cargo within time. There was an appreciable falling off, but with this the deliveries for November and the early part of December were not largely disproportionate to those of an equal length of time immediately preceding; the latter deliveries being a little over one-sixth less than those for the former period of time.

There are always some chances to take upon prompt delivery of freight by rail. I speak of this, barring accidents and unusual impediments. Such delays are to be anticipated by the shipper, and for which he is remediless unless special provision is made for reparation. There were no railway accidents relied upon as contributing to the delay, and no impediments hindering the moving of freight, unless it be said that the nonpayment of freight money for a couple of days had that effect. Nor is the hindrance complained of attributable to car shortage. The evidence does not show that there was such a shortage, but that the railroad company failed to move the charterers' grain when and as rapidly as ordered. The difficulty was in getting it moved in sufficient quantities at the particular time it was wanted for exportation abroad, and this without the railway lines assigning any particular excuse or reason for the delay. It is not, in my opinion, the intendment of the charter party that the ship should take the chances of such a delay as this. It was not more than might have been anticipated to have occurred through the usual movement of commerce by rail, and the charterers must be held to have engaged an excessive tonnage for exportation, to their own peril. Where therefore the charterers' own act is the proximate cause of the delay, another cause, more remote, contributing thereto, will not avail to excuse them. Fundamentally, the law looks to the immediate cause conducing to a particular result, and does not concern itself with causes of causes, or those which are remote and not directly consequential. The principle was applied in W. K. Niver Coal Co. v. Cheronea S. S. Co., supra, and this without particular reference to the part that the parties complaining bore in producing the proximate cause. With how much greater force, then, should the rule apply where the parties are themselves promoters of such impelling cause. In this connection should be mentioned the claim that shipment by rail was suspended for two days, namely, from October 29th to the 31st, by reason of freight charges not having been paid on the part of the shippers in the usual way, arising from a stringency in the money market. This special delay, however, was manifestly inconsequential in its effect upon the general situation.

Rainy days are to be excluded under the charter party from the time agreed upon for loading the ship, and it becomes a question as to the kind of days that are to be considered rainy days in Portland Harbor, where the loading was to be done. The question was determined by Judge Deady in the case of Balfour v. Wilkins, 5 Sawy. 429, 437, Fed. Cas. No. 807, in 1879, as comprising such days as, by reason of rain precipitation and storm, cargo cannot be safely and conveniently loaded aboard vessels. Rain falls many days which does not neces-

170 F.—7

sitate the suspension, or even retard in any appreciable measure the work of loading, and shippers and longshoremen do not regard it at all. Such days as these were manifestly not within the intendment of the charter party. Other days, again, may be attended with heavy rainfall and strong winds, which may at times materially inconvenience and even endanger the work, and yet, in the experience of shipping within the Portland Harbor, it is a rare exception when the workmen are laid off on account of storms. It is essential to keep the chutes dry in loading sacked grain, and also to protect the grain itself from getting damp; but awnings are provided, which serve in general as sufficient protection against dampness, as well as shelter for those engaged in the service. But when the rainfall is heavy, accompanied with high winds, the work is necessarily more or less retarded in keeping the awnings, being of a temporary character, in place, and the inconvenience is great in proportion to the violence of the storm. While it is evidently not the intendment to except all days upon which rain falls from the stipulated lay days, yet the phrase "rainy days" must be accorded a significance; otherwise it should not have been introduced in the charter party. Weather conditions have not changed perceptibly in this locality since Judge Deady rendered his decision. While the appliances for protection against storm are perhaps improved, yet, withal, his definition is as applicable now as then. All days when the violence of rain and storm materially and essentially retards the work of loading vessels in the harbor, because of the inconvenience and danger incurred, were no doubt within the purpose of the parties to be excepted from the lay days stipulated for. Being so within that purpose, it is the right of either party to insist upon the exclusion of such days, whether it was possible that loading could have been done or not. From a report of the Weather Bureau station at Portland, it is shown that the rainfall and average hourly velocity of the wind in 24 hours, for the stormiest days in November, were as follows:

November 13, 14/100 of an inch, 3 9/10 miles per hour.
"       15, 10/100   "      "   3 8/10   "        "
"       19, 70/100   "      "   10 5/10  "        "
"       20, 40/100   "      "   10       "        "
"       22, 50/100   "      "   12       "        "
"       23,  1.51  inches,     18 8/10   "        "
"       25, 48/100 of an inch, 13 9/10   "        "
"       26, 12/100   "      "   4 8/10   "        "
"       27, 27/100   "      "   3        "        "

Out of all these days, there is one that must have caused more or less difficulty and inconvenience in loading; that being the 23d. The rain fell incessantly throughout the day, aggregating 1.51 inches within 24 hours. The greatest velocity of wind was 36 miles per hour. This occurred at 6:30 p. m. But the average hourly velocity was 18.8 miles. I do not think that it was within the intendment of the charter party that the charterers should be required to load the ship on such a day as that. It was one of the stormiest of the season, and should be excepted from the lay days specified for loading. None of the other days approximate this in severity of the weather, and work could evidently proceed without any material inconvenience. None of these should be excepted. It is true that the charterers continued

with the work of loading another ship on the 23d, notwithstanding the inclemency of the weather; but the intendment of the charter party must govern, and, if the day was such that the charterers were not required to load a cargo aboard ship, they could proceed with the loading or not, as they might feel disposed, and the ship cannot hold them accountable for the delay.

The next question arising is touching the signification of the word "holiday" as used by the parties in the charter party. The charter party, so far as it concerns the demurrage which forms the basis of this libel, was entered into to be executed in the Portland Harbor, and the term "holiday" must receive the meaning that should be attributed to it under the laws and customs regulating shipping on navigable waters within the state of Oregon, or within the jurisdiction of its laws. The statute of Oregon declares certain days enumerated therein to be legal holidays. Among them are Sunday, the 1st day of January, etc., "and every day appointed by the President of the United States or by the Governor of this state as a day of public fasting, thanksgiving, or holiday." It provides, further, that:

"Negotiable instruments falling due on any legal holiday shall be due and payable on the next succeeding business day." Sections 3918, 3919, B. & C. Comp. Or.

By section 946 of the same compilation it is declared, in effect, that no court of justice can be opened, or can judicial business be transacted, on the days mentioned above, with certain enumerated exceptions.

By none of these sections, nor by any other provisions of the statute, so far as I am aware, are persons forbidden to labor or do any work, neither is there any penalty prescribed for any violation of the law; the purpose being manifestly to declare what days are legal holidays, and what business is affected by the fact that such days are so declared to be holidays. The business affected has relation to the coming due of negotiable instruments, the holding of courts of justice, and the transaction of business therein. It does not seem to have been the intendment of the Legislature to affect any other relations of the populace, either ecclesiastical or civil. Excepting the effect as it respects negotiable instruments, there was apparently but one purpose of the Legislature in the enactment of this legislation, which was to create what the words import, "legal holidays" as distinguished from holidays in the general sense; that is to say, the holiday of the statute is dies non juridicus, a day not judicial, not a court day. See Whitney v. Blackburn, 17 Or. 564, 21 Pac. 874, 11 Am. St. Rep. 857; Lampe v. Manning, 38 Wis. 673.

Further than this, there is no mandate that the day shall be observed by ceasing from labor, or by indulging in religious worship, public thanksgiving, or fasting, or adhering to any specific custom or practice. Speaking of the effect of the Governor's proclamation appointing a day of thanksgiving and declaring it a holiday, Mr. Justice Grier, in Richardson v. Goddard et al., 23 How. 28, 43, 16 L. Ed. 412, says:

"It is matter of history that the state of Massachusetts was colonized by men who fled from ecclesiastical oppression, that they might enjoy liberty of conscience, and that, while they enforced the most rigid observance of the

Lord's Day as a Sabbath, or day of ceremonial rest, they repudiated with abhorrence all saints' days and festivals observed by the churches of Rome or of England. They 'did not desire to be again brought in bondage, to observe days and months, and times and years.' And while they piously named a day in every year which they recommended that Christians should spend in fasting and prayer, they imposed it on no man's conscience to abstain from his worldly occupations on such day, much less did they anticipate that it would be perverted into an idle holiday. The proclamation of the Governor is but a recommendation. It has not the force of law, nor was it so intended. The duties of fasting and prayer are voluntary, and not of compulsion, and holiday is a privilege, not a duty. In almost every state in the Union a day of thanksgiving is appointed in the fall of the year by the Governor, because there is no ecclesiastical authority which would be acknowledged by the various denominations. It is an excellent custom, but it binds no man's conscience or requires him to abstain from labor."

The observance of the day binds no man's conscience in this: That the act of nonobservance is not made malum prohibitum, an evil prohibited, with a penalty attached for the breach of the law. The occasion, however, is worthy of universal respect, and the moral obligation for the observance of the day of thanksgiving in pursuance of the proclamation of both the President and the Governor is cogent and strong. So it is that many people throughout the United States, and in every state, keep the day by ceasing from labor, and observing religious worship or indulging in pleasurable pursuits. In Tweedie Trading Co. v. Pitch Pine Lumber Co. (D. C.) 156 Fed. 88, 89, "A holiday is one," says Hough, District Judge, "created by general acceptance and observance, to which dignity it may arrive without the aid of statute law."

Under the charter party, holidays are not to be counted as lay or working days, and by the fifteenth paragraph it is stipulated that lay or working days shall not count when the supply or bringing by rail, craft, or otherwise to port of loading or alongside the vessel, or the loading is delayed by holidays, ecclesiastical or civil. The stipulation almost defines the term, namely, that the holiday must be considered such a day so given over to that purpose as delays the bringing of cargo alongside the vessel, or the loading of the same. Thus it would seem that the contracting parties intended the application of the term to be made in its general sense, not in its statutory sense, as legal holidays. There is but little or no evidence showing to what extent Thanksgiving Day is observed in the Portland Harbor, but I think the court may take judicial knowledge of the fact that the day is generally observed by a great many people within the state and about Portland, that while the custom does not prevail to such an extent as to absolutely prevent the procurement of labor for loading, yet that it impedes its procurement in a material way, and hence that the day was within the intendment of the charter party; but, further than this, other holidays declared by the Governor were not within such intendment.

Rejecting November 23d as a rainy day and the 28th as a holiday, the ship was detained seven days beyond her stipulated lay days, for which the libelant should recover the sum of $1,531.74, with interest from December 6, 1907, at 6 per cent. per annum, and such will be the order of the court.