## KERR et al. v. SCHWANER.

(Circuit Court of Appeals, Ninth Circuit. February 7, 1910.)

### No. 1,747.

1. SHIPPING (§ 181*)—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY.

A provision of a charter party for the carriage of a "full and complete cargo of wheat in sacks," to be loaded by the charterers within lay days fixed, that lay days should not be counted during any time the bringing of the cargo to the port of loading by rail should be delayed by railway accidents, "or any other hindrance * * * beyond the charterer's control," did not entitle the charterers to hold the vessel until the arrival of sufficient wheat of a particular kind was received, when they had sufficient of other kinds to load her within the time stipulated; but any delay on such account was at their risk as to the time to procure and load such cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 589–592; Dec. Dig. § 181.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 342.]

2. SHIPPING (§ 181*)—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY.

Under a charter of a vessel to carry a cargo of wheat to be loaded by the charterers within a time specified, which contained a provision that lay days for loading should not be counted during any time the bringing of the cargo to the port of loading was delayed by railroad accidents, or any other hindrance beyond the charterer's control, where the charterers

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

loaded only with a particular grade of wheat which they had with other grades stored on lines of a railroad company, they were not entitled to the benefit of such provision, on the ground that the company did not furnish sufficient cars to bring in that particular wheat within the time fixed by the charter, when their notice to the company was only to furnish cars generally, and it did furnish sufficient to bring in double the quantity required, but in part of different grades, which the charterers loaded on other vessels.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*]

3. Shipping (§ 181*) — Demurrage — Construction of Charter Party — "Rainy Days."

A provision of a charter party for the carriage of a cargo of wheat to be loaded at Portland, Or., that "rainy days" should not be counted as lay days for loading, is presumed to have been made with reference to the established rule of that port and excludes only days on which, on account of rain and with reference to the facilities of the port in the way of covered docks, etc., for the protection of vessels while loading, cargo could not be safely and conveniently loaded.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*

For other definitions, see Words and Phrases, vol. 7, p. 5916.]

4. Shipping (§ 181*)—Demurrage—Construction of Charter Party—"Holidays."

A provision of a charter party that "holidays" should not be counted as lay days for loading must be construed in accordance with the presumed intention of the parties to exclude only such days as were holidays in the usual and ordinary sense, which were customarily observed by a cessation of work, and did not entitle the charterers to exclude a series of holidays subsequently appointed by the Governor on account of a financial panic for the sole purpose of deferring the maturity of financial obligations, and which were not observed, nor intended to be observed, by a cessation of labor or traffic.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*

For other definitions, see Words and Phrases, vol. 4, p. 3321.]

Appeal from the District Court of the United States for the District of Oregon.

Suit in admiralty, by J. H. Schwaner, as master of the steamship Tiberius, against Peter Kerr, Thomas Kerr, and Andrew Kerr, partners as Kerr, Gifford & Co. Decree for libelant, and respondents appeal. Affirmed.

For opinion below, see 170 Fed. 92.

The case comes here upon an appeal from the decree of the District Court in favor of the libelant for the sum of $1,531.74, with interest and costs in a cause of demurrage by reason of the delay of the respondents in loading the German steamship Tiberius of Hamburg.

Teal, Minor & Winfree, for appellants.

Veazie & Veazie, for appellee.

Before GILBERT and MORROW, Circuit Judges, and HUNT, District Judge.

MORROW, Circuit Judge. The charter party in this case is dated October 3, 1907, and provides for a full and complete cargo (not ex-

ceeding what she can reasonably stow or carry) of wheat in sacks to be loaded at Portland, Or. The charter party contains the following provisions:

"8. Fourteen working lay days (Sundays, holidays, and rainy days * * * not to be counted as lay or working days), to commence twenty-four hours after the inward cargo and or ballast shall have been finally discharged, and the captain has given charterers written notice, accompanied by surveyor's certificate that his vessel is ready to receive cargo, are to be allowed charterers for loading at places as hereinbefore provided, but should the loading be completed in less time charterers have the privilege of detaining the vessel until the expiry of said lay days."

"14. It is agreed that for each and every day's detention or demurrage at the port of loading, by default of said parties, of the second part, or their agents, fourpence per net register ton, or its equivalent, per day shall be paid day by day, by said parties of the second part, or their agent, to said party of the first part or his agent.

"15. Lay or working days shall not count at ports of loading, during any time when the supply or loading of stiffening, or the supply or bringing by rail, craft, or otherwise, to port of loading or alongside the vessel, or the loading of the cargo, or intended cargo, or any part thereof, is delayed by * * * holidays (ecclesiastical or civil), railway accidents or impediments, or any other hindrance, of whatsoever nature beyond the charterer's control."

The Tiberius arrived at Portland on the 7th day of November, 1907, and at 9 a. m. on Monday the 11th of November, 1907, libelant, as master of the Tiberius, gave the respondents notice, accompanied by the certificate of the competent surveyor selected by the respondents, that the vessel was ready to take in cargo under the terms of the charter party. Lay or working days for loading commenced to run 24 hours after the service of the notice, or on Tuesday morning, November 12th. Excluding Sundays, the 14 lay or working days expired on Wednesday, November 27th, unless extended by some provision of the charter party. The vessel was not loaded until the afternoon of December 6th, or nine days after the expiration of the period of 14 days just stated. The respondents refusing to pay demurrage on this delay, the libelant brought this suit to recover from respondents demurrage for nine days at the rate of £45 1s., sterling, equal to $218.82, United States gold coin, amounting to the sum of $1,969.38. The respondents resisted libelant's claim on the grounds that the respondents had ample cargo with which to load said steamship within the time specified, but that, without the negligence, fault, or connivance of the respondents, the railroad company failed and refused to furnish cars for the transportation of said cargo to the port of loading, although requested and importuned by respondents to furnish cars for the transportation of the cargo to said vessel; that the delay in transporting the cargo to the port of lading and the delay in loading said steamship were entirely beyond the control of respondents. The respondents claimed, further, that the 13th, 15th, 19th, 20th, 22d, 23d, 25th, 26th, and 27th days of November and the 4th and 6th of December, 1907, were "rainy days" within the meaning and intent of that term as contained in the charter party; and that each and all of the days intervening between the giving of said notice to respondents by the master of said steamship and the completion of the lading of said steamship were legal holidays duly proclaimed, published, and declared by the Governor

of the state of Oregon as legal holidays save and except the 5th, 6th, and 7th days of December, 1907.

It was stipulated between the parties that Thursday, the 28th day of November, was what is generally termed "Thansgiving Day," and was a legal holiday within the contemplation of the charter party in controversy and excluded from the count of lay or working days.

The court below found as a fact that from November 11th to November 27th, inclusive, more than sufficient wheat arrived at Portland for the loading of the Tiberius by the respondents; that there was no hindrance arising from dilatoriness on the part of the railway lines in delivering cargo sufficient to load the Tiberius; that two other ships, namely, the British Monarch and the Borderer, each of about the same tonnage as the Tiberius, were loaded ahead of the Tiberius, notwithstanding they arrived later. The court found that November 23, 1907, was a rainy day, and excluded that day from the count of lay or working days, as it did also Thanksgiving Day, or Thursday, November 28th, under the stipulation; but rejected the claim of respondents that the other specified days were rainy days, finding as a fact that such other days were not rainy days. The court also rejected the claim that the intervening days (other than Sundays and Thanksgiving) between Monday, November 11th, and Thursday, December 5th, were legal holidays. The court found that, excluding November 23d as a rainy day and November 28th as Thanksgiving, the ship had been detained seven days beyond the stipulated lay days, and thereupon entered a decree in favor of the libelant for the sum of $1,531.74, with interest. Schwaner v. Kerr (D. C.) 170 Fed. 92. The findings and decree of the court in rejecting respondents' defenses are assigned as errors.

There is no question but that sufficient wheat arrived at Portland for the loading of the Tiberius by the respondents during the actual lay or working days between November 11th and November 28th. The Tiberius, when finally loaded, carried 5,966 tons of wheat. The British Monarch arrived in Portland after the Tiberius and late in the day of November 7th, under charter to the respondents, and was loaded by them commencing November 11th and finishing November 14th. The Borderer arrived in Portland on November 11th, also under charter to the respondents, and her loading was finished by them on November 28th. A. Mann, shipping clerk for the respondents, was called as a witness by them, and testified that he was familiar with the movements of grain and the dates of charters and the loading and leaving of vessels loaded by respondents; that the respondents loaded 11,209 tons of wheat in the month of November, 1907; and that the vessels loaded were the British Monarch and the Borderer. The excuse given for the delay in loading the Tiberius is that the respondents determined on October 10, 1907, that they would load the Tiberius with a quality of wheat described as "No. 1 Blue Stem." The charter party was executed October 3, 1907. The cargo to be shipped on the vessel is there described as "a full and complete cargo (not exceeding what she can reasonably stow or carry) of wheat in sacks." The owner of the Tiberius did not agree that his vessel should be held for a cargo of "No. 1 Blue Stem Wheat," and it does not appear that he or his agents even knew that the vessel was being so held. His agreement was that

the vessel should carry a full and complete cargo of wheat in sacks. It was immaterial to him what quality or grade of wheat should be loaded on the vessel; but it was material to him when it should be loaded, and, when the respondents held the vessel for a special grade of wheat to be thereafter received, they did so at their own risk as to the time to procure and load such a cargo of wheat. But it appears from the evidence that no specific cargo of wheat was bought by the respondents for the Tiberius. Wheat of various qualities was purchased by them in the interior without regard to cargo shipments from Portland, and, when they called upon the railroad company to carry their wheat from such interior points to Portland, they did not specify any particular grade or quality of wheat to be carried. The request was that the railroad company should furnish cars for the transportation of wheat generally, and this they did, enabling respondents to load 11,209 tons of wheat on the British Monarch and the Borderer during the month of November. The cargo of the British Monarch consisted of No. 1 White Walla Walla, No. 1 Red Walla Walla, and No. 1 Blue Stem, about one-third of each. The several grades of wheat in the cargo of the Borderer is not stated, but is described simply as a superior grade of wheat. The failure of the railroad company to furnish as many cars in the aggregate for the transportation of all kinds of wheat in the month of November as they had furnished in the month of October, or afterwards in the month of December, does not excuse the respondents on the ground that the railroad company hindered and impeded them in loading this particular vessel with a cargo of wheat of a particular grade or quality. If the respondents had the ample cargo of wheat of particular quality with which to load the Tiberius within the time specified, as they say they did, they should have notified the railroad company to carry and deliver the particular quality of wheat that was to constitute that cargo from such places, and at such times as would enable them to load the vessel within the time limited in the charter party. Had they given such a notice, and the railroad company had then failed to transport such wheat to the place of loading, a different question could have been presented. But the respondents failed and neglected to give such a notice, and this neglect is sufficient, in our opinion, to deprive the respondents of any extension of the period for lay or working days on account of a delay or hindrance in the movement of cars claimed to have been beyond their control.

It is assigned as error that the court failed to find that November 19th, 20th, 22d, and 25th were rainy days. In paragraph 8 of the charter party it is provided that:

"Sundays, holidays and rainy days * * * not to be counted as lay or working days."

In paragraph 15 it is provided that:

"Lay or working days shall not count at ports of loading, during the time when * * * the loading of the cargo, or intended cargo, or any part thereof, is delayed by * * * rain."

It appears from the evidence that some rain fell on the days named, but not sufficient to have delayed or interrupted the loading of the vessel had the loading been in progress; but as the vessel was not being

loaded, and the loading was not in any respect delayed on that account, we may dismiss the excuse that the loading was delayed by rain and by reason thereof respondents entitled to have such days excluded from the count as lay or working days under paragraph 15 of the charter party. Were such days excluded from the count of lay or working days under paragraph 8? A provision of this identical character was contained in the charter party in Balfour v. Wilkins, 5 Sawy. 429, Fed. Cas. No. 807, and the question as to the meaning of the term "rainy days" as contained in the charter party was there fully considered, discussed, and determined with specific reference to lay days in the work of loading vessels at the port of Portland. The court there said:

"The burden of proof is upon the charterer to show that there were such days (rainy days). The parties are presumed to have had in mind the known condition of things at this port when the contract was made, and contracted with reference to it; for instance, that there were covered wharves here from which cargo could be, and commonly was, safely and conveniently loaded in all ordinary rainy weather. The phrase 'rainy day,' then, as used in this contract, and as both parties to it must have understood it, means a day on which cargo could not be safely and conveniently loaded at this port."

This decision was rendered in 1879, and the interpretation thus placed upon the term "rainy days" as used in a charter party for the port of Portland has never since been questioned. It will therefore be presumed that the term was used in this charter party as it had been defined by the court and had become recognized in referring to climatic conditions in the port. It appears from the evidence in this case that the dock where the Tiberius was loaded was a covered dock, and when it rains it is the custom for the stevedores to put up awnings running from the dock above the chutes to the vessel and over the hatchway, down which the grain is lowered to the hold so as to protect the cargo from the rain as the cargo is being loaded. The only exposure then is when the rain is accompanied by high wind that blows the rain under the awning. In such a case a wind-brake is erected to prevent the rain from being driven under the awnings. The testimony is to the effect that no attention whatever is paid to an ordinary rainy day in the loading of grain vessels in the harbor at Portland. This evidence is confirmed by the action of the respondents themselves in loading the Borderer and Tiberius. From a report of the Weather Bureau Station at Portland it appears that the rainfall, the greatest velocity, and average velocity of the wind in 24 hours, were as follows:

November 19th, rainfall, $70/100$ of an inch; greatest velocity of wind, 20 miles per hour; average hourly velocity of wind, 10.5 miles.

November 20th, rainfall, $41/100$ of an inch; greatest velocity of wind, 32 miles per hour; average hourly velocity of wind, 10 miles.

November 22d, rainfall, $50/100$ of an inch; greatest velocity of wind, 27 miles per hour; average hourly velocity of wind, 12 miles.

November 25th, rainfall, $48/100$ of an inch; greatest velocity of wind, 26 miles per hour; average hourly velocity of wind, 13.9 miles.

As the loading of the Tiberius did not commence until November 27th, neither the fall of rain nor the velocity of the wind prevented the loading of the vessel on those days. But if the loading of the vessel

had been in actual progress, could the loading have been safely and conveniently continued during those days? They did in fact load the Borderer on those days, and it appears that the Tiberius was being loaded on December 4th and December 6th. From a report of the Weather Bureau, it appears that the rainfall, greatest velocity of wind, and average hourly velocity on these days were as follows:

December 4th, rainfall, $^{27}/_{100}$ of an inch; greatest velocity of wind, 40 miles per hour; average hourly velocity of wind, 12.1 miles.

December 6th, rainfall, $^{52}/_{100}$ of an inch; greatest velocity of wind, 13 miles per hour; average hourly velocity of wind, 3.4 miles.

We are of opinion that, as the respondents were able to load the Borderer on the days named and the Tiberius on December 4th and 6th under the conditions of rain and wind prevailing during those days, they could have safely and conveniently loaded the Tiberius on the days claimed as rainy days in November, and that the court was right in holding that the November days named were not "rainy days" as that term is used in the charter party.

It is next contended by the respondents that all the days intervening between November 11 and December 5, 1907, were legal holidays and excluded from the count as lay or working days under the charter party. The word "holidays," like the term "rainy days," is used in paragraphs 8 and 15 of the charter party and in the same relation to other provisions of this section. As the loading of the vessel was not in any respect delayed by reason of these holidays, respondents' claim to have such holidays excluded from the count as lay or working days under paragraph 15 need not be further considered. Were they excluded under the provisions of paragraph 8? On the 28th day of October, 1907, the Governor of Oregon issued a proclamation in which it was recited that the banks of Oregon and of the West had large balances due them from banks in New York, Chicago, Boston, Philadelphia, St. Louis, St. Paul, Minneapolis, Omaha, and other Eastern cities, and because of the strained financial situation throughout the East the banks in said cities had refused to make shipments of coin or currency in payment of said balances to the banks of Oregon and other Western banks, and, as a result of the action of said Eastern banks, it was impossible for the banks of Oregon to continue in the exercise of their functions without great injury to the industries of the state. It was stated that, for the common good of the people of the whole state, it was necessary that a holiday be proclaimed in order that an opportunity might be afforded to the financial institutions of the state to procure from Eastern banks the balances then due them as stated in the proclamation. The Governor thereupon proclaimed the 29th, 30th, and 31st days of October and the 1st and 2d days of November, 1907, legal holidays, to the end that time and opportunity might be given to the banking institutions of the state to arrange for shipment of money then due them from banks of the Eastern states therein named, without which every industry of the state must suffer and the growth and development thereof be greatly retarded. And thereafter, beginning at midnight on the 2d day of November, 1907, the Governor duly issued a proclamation in substantially the same form as that of the proclamation of October 28th, declaring each and every subsequent day a legal

holiday up to the time of the departure of the Tiberius from the port of Portland, save and except that no such proclamation was issued with reference to the 5th, 6th, and 7th days of December, 1907.

When the charter party in this case was executed, did the parties to the contract have in view these holidays appointed by the Governor for the sole purpose of enabling the banks of the state of Oregon to bridge over a financial stress, and was it the purpose of the parties to the contract to exclude such days from the lay or working days designated for the loading of the vessel?

In Nash v. Towne, 5 Wall. 689, 699, 18 L. Ed. 527, the Supreme Court of the United States, speaking of the language of a contract relating to the sale and delivery of certain barrels of flour, said:

"Courts, in the construction of contracts, look to the language employed, the subject-matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words and of the correct application of the language to the things described."

In Merriam v. United States, 107 U. S. 437, 441, 2 Sup. Ct. 536, 27 L. Ed. 531, this rule was applied to a contract for the sale and delivery of a quantity of oats, and in O'Brien v. Miller, 168 U. S. 287, 297, 18 Sup. Ct. 140, 144, 42 L. Ed. 469, the rule was applied in admiralty in the construction of a bottomry bond. It was there said:

"The elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them."

It was further stated that:

"In the exercise of their jurisdiction with respect to such bonds, courts of admiralty are not governed by the strict rules of the common law, but act upon enlarged principles of equity"—citing the opinion of Mr. Justice Story in The Virgin, 8 Pet. 538, 550, 8 L. Ed. 1036.

The rule that a contract will not be held to include a condition within the words of the contract, but not contemplated by either of the parties when the contract was made, was held in United States v. Stage Co., 199 U. S. 414, 423, 26 Sup. Ct. 69, 50 L. Ed. 251.

In the present case, the parties to the contract could not have had in view the series of holidays appointed by the Governor of the state for the sole purpose of deferring the maturity of financial obligations and liabilities, nor could they have had in contemplation an interpretation of the contract that would properly have included such days as holidays. These days were not holidays in the usual and ordinary sense. They were not set apart for rest, recreation, fasting, thanksgiving, or for public rejoicing, or public mourning; nor were they so observed. The evidence shows that there was no cessation of labor or traffic on account of these days. The loading of the vessels went on as usual. As before stated, the respondents received and loaded 11,209 tons of wheat during the month of November, loading and dispatching the British Monarch and the Borderer; each having a tonnage about the same as the Tiberius. It appears from the evidence that stevedores at

Portland are accustomed to be paid "time and a half" for overtime and holidays; but during the days appointed by the Governor as holidays they neither asked nor received such extra pay. They worked as usual and upon the usual terms. These days were lay or working days at the port of Portland, and so treated by the parties to the contract. We are therefore of opinion that they were properly so held by the court below.

The decree of the District Court is affirmed.